(November 10, 1987)

■ FRANK P. DILLON, Respondent-Appellant, v MARK SILVER et al., Defendants, and THEODORE JACKAWAY, Respondent, and MICHAEL J. KLEIN et al., Appellants.—Order of the Supreme Court, New York County (Arthur E. Blyn, J.), entered on September 4, 1986, which denied the motion by defendants Michael J. Klein and Idant Laboratory for summary judgment and granted the motion by defendant Theodore Jackaway for summary judgment, is reversed, on the law, and the motion for summary judgment dismissing the complaint as against Michael J. Klein and Idant Laboratory is granted, and the motion for summary judgment dismissing the complaint as against Theodore Jackaway is denied, without costs or disbursements.

In this medical malpractice action, plaintiff is the father of decedent Barbara Dillon, a 22-year-old student attending SUNY at New Paltz, who died after suffering complications from an abortion performed on her on April 18, 1981 by defendant Dr. Mark R. Silver at defendant Long Island Gynecological Group, P. C. (LIGG) in Hempstead, Long Island. Defendant Idant Laboratory's connection to the instant case arises out of its analysis of a tissue specimen delivered to its Manhattan office on April 21, 1981. The sample was identified by LIGG as being tissue from Barbara Dillon's abortion. Defendant Dr. Michael J. Klein carried out the microscopic analysis on behalf of Idant.

Dr. Klein's finding and that of Idant's histotechnologist, who performed the gross examination of the specimen, were promptly reported to LIGG on the following day, April 22, 1981. The result of both the microscopic and gross examination was that the sample consisted of placental tissue and no fetal parts. It is undisputed that this determination was accurate, nor is there any indication in the record that the procedures employed by Idant or Klein constituted departures from acceptable medical practice. In addition, the finding of placental tissue is consistent with a terminated uterine pregnancy and does not eliminate the possibility of a tubal pregnancy, which apparently caused or contributed to Dillon's death. While a double pregnancy, one in the uterus and one in the fallopian tubes, is a rare event, it occurs in approximately one out of every 30,000 pregnancies. In that regard, there is also no evidence that the tissue sample forwarded to Idant could, or should, have revealed the existence of a double pregnancy and that, therefore, Idant or Klein could, or should, have been aware of such a condition.

Dr. Klein asserts, and plaintiff does not contradict, that if a patient's pregnancy is located outside the uterus in her fallopian tube, evacuation of the uterus will not remove the ectopic pregnancy, and pathological analysis of a specimen taken from the uterus will not show the existence of the other pregnancy. In the present situation, the record demonstrates that Dillon's sample contained placental tissue, thus indicating a uterine pregnancy, and this information was conveyed to LIGG. Plaintiff does urge that Dillon had a single, ectopic pregnancy, the possibility of which was not adequately communicated to LIGG. This theory derives almost entirely from the fact that a double pregnancy was highly unlikely. Yet, a claim based on statistical improbability is not, standing alone, sufficient evidence to raise an issue of fact concerning the validity of the pathology report submitted by defendants Idant and Dr. Klein.

Finally, notwithstanding plaintiff's assertion to the contrary, there is no proof that specimens could possibly have been mixed up at the laboratory such that Dillon's sample was switched with that of another patient. Indeed, this allegation is largely speculative since the paraffin block from which Dillon's slide was made is still available and matches up with the slide analyzed by Dr. Klein. The paraffin block is indelibly marked with Dillon's identification number, and it is, therefore, irrelevant whether or not the slides themselves were marked with a pencil. Consequently, in the absence of any disputed issues of fact sufficient to defeat the motion for summary judgment by defendants Idant and Klein, the complaint against them should have been dismissed.

The Supreme Court, however, did grant the motion for summary judgment by defendant Dr. Theodore Jackaway. Dr. Jackaway was an attending physician at defendant Kingston Hospital to which Dillon was admitted after suffering severe abdominal pain. Although she had been experiencing vaginal bleeding and occasional pain in her lower abdomen since about May 5, 1981, her condition had worsened enough by May 10th for her to visit the emergency room at Kingston Hospital. There she was treated by defendant Dr. Kalyanasundaran Venkataraman for presumed inflammatory disease and sent home with antibiotics. She was also advised to call Dr. Jackaway, a gynecologist, for follow-up care. Pursuant to the bylaws of the hospital, attending physicians, including Dr. Jackaway, were required to be on call for certain periods and to accept all patients referred, without qualification. Dr. Jack-

away was the only doctor on call at Kingston Hospital for the month of May in the specialties of obstetrics and gynecology.

At any rate, Dillon returned home from the hospital and, later that same evening, again suffered from abdominal pain and vomiting. One of her roommates telephoned the emergency room at Kingston Hospital and was informed that time had to be allowed for the antibiotics to take effect. When Dillon's pain did not abate, a roommate telephoned Dr. Jackaway, as directed by Dr. Venkataraman, at around 5:30 in the morning of May 11, 1981, leaving a message with Dr. Jackaway's answering service. Dr. Jackaway returned the call and apparently spoke to one of Dillon's roommates, explaining that he only wanted to ascertain what was going on and that he could not take any responsibility for Dillon because he had not previously seen her. He then recommended that she be taken to the emergency room.

Some three hours after being turned away by Dr. Jackaway, Dillon, still experiencing abdominal pain, contacted a neighbor, who called the university's health center, where defendant Dr. Johannes D. Weltin worked. Dr. Weltin requested that she be brought in, but she lost consciousness on the way and arrived at 9:25 A.M. with no respiration, blood pressure or pulse. She was then rushed to the emergency room at Kingston Hospital. According to Dr. Weltin at his examination before trial, he called Dr. Jackaway from the emergency room and told him that the patient had blood in the abdomen and needed immediate surgery. Dr. Jackaway refused to see her, stating that he did not know anything about her and did not feel that he should become involved at that point. Dr. Weltin thereafter attempted to enlist the aid of a Dr. Kirk for a surgical consultation. The latter declined, although he too seems to have telephoned Dr. Jackaway without success. It was not until 11:45 that morning, more than an hour and a half after Dillon had been brought to the emergency room, that Dr. Venkataraman was finally called in. He performed an emergency laparotomy, but Dillon nonetheless went into irreversible shock and died.

In granting Dr. Jackaway's motion for summary judgment and dismissing the complaint against him, the Supreme Court recognized that by refusing to treat Dillon, he had violated the hospital's bylaws, and he may also have breached moral and ethical obligations toward her. However, the court determined that in the absence of any physician/patient relationship, the failure to render medical assistance could not be the predicate for legal liability. We disagree that the facts of this case

warrant summary judgment as a matter of law. Dr. Jackaway, as an attending physician at Kingston Hospital, was obliged to devote a certain amount of time to service patients who were referred to him. He was the doctor on call for OB/GYN in May of 1981 and his name had been provided to Dillon for follow-up care by Dr. Venkataraman, then the emergency room doctor. Moreover, the hospital's bylaws not only mandated that the "designated service physician" accept all patients referred but also stated that the emergency room physician had the authority to decide which service physician(s) should be called and required that the service physicians respond when requested to do so by the emergency room physician. Since Dr. Venkataraman had instructed Dillon to contact Dr. Jackaway in the event of any further problems, it can be argued that she was already his patient. Certainly, his refusal to see her, thus creating unnecessary delay and relegating Dillon to treatment by a surgical resident, may well have contributed to her death.

Dr. Jackaway contends that there was a custom and procedure whereby certain doctors such as himself would be notified before a patient was discharged from the emergency room. Yet, while Dr. Jitendra Sisodia, chief of the emergency room, acknowledged at his examination before trial that a "courtesy list" was maintained of doctors who insisted on being called by the hospital, it is a question of fact whether such a practice of prior notification was intended to supplant the bylaws and, indeed, if Dr. Jackaway was even one of those physicians who had requested prior notification. At any rate, Dr. Jackaway has not demonstrated that there are no issues of fact here either with respect to the existence on his part of an obligation to treat Dillon (that is, whether a physician-patient relationship had been created herein) and, if so, whether his abandonment of her was a factor in her death (see, Matter of Shephard v Ambach, 68 AD2d 984; O'Neill v Montefiore Hosp., 11 AD2d 132). As for Dr. Jackaway's assertion that plaintiff's decedent was not an intended third-party beneficiary of his arrangement with Kingston Hospital, it need only be pointed out that plaintiff is not seeking to enforce the bylaws but to recover in malpractice for a duty which those bylaws may have imposed upon Dr. Jackaway with respect to certain of the hospital's patients. Concur— Murphy, P. J., Kupferman, Carro, Milonas and Rosenberger, JJ.